IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:16-CV-214-D

JOHNNIE IVEY JOHNSON,            )
                                 )
                    Plaintiff,   )
                                 )
        v.                       )            **ORDER**
                                 )
PITT COUNTY BOARD OF EDUCATION,  )
MONICA JACOBSON, PAUL BRINEY,    )
ERICA COOKE, KISHLYN JONES,      )
DR. ETHAN LENKER, and GLEN BUCK, )
                                 )
                    Defendants.  )

On August 19, 2016, Johnnie Ivey Johnson ("Johnson" or "plaintiff"), proceeding pro se,

sued the Pitt County Board of Education, Monica Jacobson, Paul Briney, Erica Cooke, Kishlyn

Jones, Dr. Ethan Lenker, and Glen Buck (collectively, "defendants), alleging abridgment of his First

Amendment right to free speech, deprivation of procedural due process under the Fourteenth

Amendment, race discrimination and unlawful retaliation under Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and age discrimination under the

Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 to 634 ("ADEA").

[D.E. 5, 5-1]. On October 17, 2016, defendants moved to dismiss the complaint under Federal Rules

of Civil Procedure 12(b)(1), (b)(2), and (b)(6) [D.E. 20] and filed a supporting memorandum [D.E.

21]. On November 10, 2016, Johnson responded in opposition [D.E. 23]. On November 22, 2016,

defendants replied [D.E. 24]. On December 8, 2016, Johnson filed a surreply [D.E. 27]. As

explained below, the court grants defendants' motion to dismiss.

I.

Johnson worked as a substitute teacher in Eastern North Carolina, including in Pitt County.

See Compl. [D.E. 5] 2. In 2012, Johnson filed an EEOC complaint against the Pitt County Board

of Education and Pitt County Schools' Director of Personnel Glen Buck ("Buck"). See Johnson v. Pitt Cty. Sch., No. 4:12-CV-191-BR, [D.E. 35] 16–17 (E.D.N.C. Nov. 12, 2013) (unpublished).

On August 27, 2015, Johnson was three days into a 16-day substitute teaching assignment at Farmville Middle School. [D.E. 5-1] 5. Johnson ran an errand and arrived late for work. Id. at 5–6. Because his student-free planning period was scheduled for first period, Johnson believed he did not have to notify the school that he would be late. Id. at 6. According to Johnson, substitutes viewed planning periods as "free time so-to-speak" because the full-time teachers had typically already performed the tasks usually undertaken during planning period. Id. When Johnson arrived roughly five minutes after first period had begun, Principal Paul Briney ("Briney") notified Johnson that Briney had already requested a replacement for Johnson. Id. Another substitute teacher filled in for Johnson the next day as well, but Johnson completed the remainder of the 16-day assignment. Id.

On September 17, 2015, Briney sent Buck an evaluation of Johnson that documented the August 27, 2015, incident of tardiness, as well as six other instances, rated Johnson's performance as "below standard" in numerous categories, and noted several concerns from students regarding Johnson's behavior. Id. at 6–7. In a letter dated September 21, 2015, Buck notified Johnson of a request from Briney that Johnson not return to substitute at Farmville Middle School. Id. Johnson never received the letter because it was mailed to the wrong address See id.

Briney did not discuss his concerns with Johnson before requesting that Johnson not return to Farmville Middle School. See id. at 7–8. Additionally, according to Johnson, the evaluation was "unfounded on its face" because it is implausible that he could accrue so many infractions without being immediately fired. Id. Johnson believed that Buck's letter notifying Johnson of Briney's request constituted Buck "approving" the request, an action Johnson alleges was in retaliation for

2

Johnson having sued Buck in 2012. Id. at 8.

On October 21, 2015, Johnson was on a different assignment, filling in during an absent teacher's World History class at J.H. Rose High School. Compl. at 2. The students were "studying the five major religions around the world, in which Christmas was included as an aspect of Christianity." [D.E. 5-1] at 1. During third period, a student asked Johnson why he did not celebrate Christmas. See id.; [D.E. 5-2] 1. Johnson stated that he does not celebrate Christmas because it "derive[s] from non-Christian, or rather pagan traditions." Compl. at 2; [D.E. 5-1] 1. Johnson classifies his statements as "quite relevant to the subject matter at hand as it was of historical facts." [D.E. 5-1] 3; see id. at 1.

The next day, J.H. Rose's principal Monica Jacobson ("Jacobson") asked Johnson to come to the school to discuss an assignment he had given during third period the previous day. Compl. at 2. During the conference, Jacobson said that Johnson's statements to the class concerning Christmas had been inappropriate. Id. Jacobson also told Johnson that she would request that the "central office" remove Johnson from the school's list of available substitute teachers. [D.E. 5-1] 1. Johnson told Jacobson not to cancel his assignment because he had not been "promoting or opposing any religion." Id. Before making this request, and "minutes after" the conference, Jacobson cancelled Johnson's substitution assignment scheduled for the following day. Id. Because Jacobson never officially lodged a request to remove Johnson from the availability list, over the ensuing weeks Johnson continued to be asked to teach at J.H. Rose. Id. Jacobson personally cancelled Johnson's assignments on six occasions. Id.

On an unstated date, Jacobson told Johnson that her decision to cancel Johnson's assignments was motivated in part by his habit of playing music in class, although two other substitutes—both white—played music too but were "never reprimanded in the least for doing so." Id. at 4–5. In

3

another incident on an unstated date, another substitute—15 years younger than Johnson—was the subject of an investigation by Jacobson for remarks the substitute allegedly made in class. Id. Further investigation rebutted the accusations, and Jacobson reinstated the substitute. Id.

On December 8, 2015, Johnson filed a formal grievance with Director of Personnel Buck. Id. at 2; [D.E. 5-2]. In his grievance, Johnson asserted that his statements about Christmas were "within the perimeters [sic] of the lesson plan on the history of various religions around the world that included the celebration of Christmas." [D.E. 5-2] 1. Buck assigned Kishlyn Jones, a Personnel Coordinator, to investigate Johnson's complaint . [D.E. 5-1] 2. Jones concluded that Jacobson "never submitted a request to block Mr. Johnson's name from subbing at the school, but had a valid reason for doing so." Id.

In January 2016, Johnson reviewed his personnel file and discovered the September 21, 2015 letter containing Briney's request that Johnson not return to teach at Farmville Middle School. Id. at 6–7. Johnson asked Buck to send him a copy of the evaluation on which the request was based, which Johnson eventually obtained. Id.

On February 3, 2016, Johnson filed an EEOC charge, which he supplemented the next day with additional information. [D.E. 20-2]. Johnson alleged age discrimination, religious discrimination, and retaliation. Id. at 1. Although not a model of clarity, Johnson's EEOC charge alleged that Jacobson cancelled Johnson's assignments in retaliation for Johnson filing an EEOC charge against Pitt County Schools in 2012; that Briney's request that Johnson not return to Farmville Middle School was made in retaliation against Johnson for filing the 2012 EEOC charge; that Buck "granted" Briney's request in retaliation for Johnson filing the 2012 EEOC charge; that Jacobson discriminated against Johnson for being a Jehovah's Witness who does not celebrate Christmas; and that Jacobson discriminated against Johnson based on his age by investigating

4

complaints against him differently, and arriving at a different final resolution, than she had done when resolving complaints against another substitute teacher. [D.E. 20-2]. Johnson did not assert race discrimination in the EEOC charge, but Johnson's EEOC charge fleetingly refers to Jacobson discriminating against him because he his black by replacing him with white substitutes "3 or 4" of the five times she had cancelled his assignments. Id. at 3. On May 3, 2016, Johnson received his right-to-sue notice from the EEOC. [D.E. 5-7].

On May 9, 2016, Jacobson again cancelled one of Johnson's scheduled assignments. Id. Jacobson's secretary, Erica Cooke, cancelled the assignment in the scheduling system and left Johnson a voicemail stating that Jacobson did not want him substituting at J.H. Rose. Id. According to Johnson, this cancellation violated Johnson's First Amendment right to free speech, his Fourteenth Amendment right to procedural due process, and was in retaliation for Johnson's constitutionally protected activity. Id. He also alleges that Jacobson canceled this assignment in retaliation for Johnson's EEOC grievance filed against Buck in 2012. Id. According to Johnson, Buck and Jones persuaded Jacobson to continue cancelling Johnson's assignments, or failed to dissuade her from doing so, and ignored Johnson's grievance. Id.

On July 28, 2016, Johnson sued defendants for violating his First Amendment right to free speech, violating his Fourteenth Amendment right to procedural due process, age discrimination, race discrimination, and retaliation. See [D.E. 5-1] 9. Johnson names defendants Jacobson, Briney, Buck, Jones, and Cooke in their individual capacities and seeks $75,000 in compensatory damages and $75,000 in punitive damages. Compl. at 2–3. He names Dr. Ethan Lenker, Superintendent for Pitt County Schools, in his official capacity to request an injunction requiring principals to confer with substitutes regarding all performance concerns before requesting that substitutes be removed from the list of available substitutes. [D.E. 5-1] 9. Defendants have moved to dismiss Johnson's

5

claims under Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(6). [D.E. 20].

## II.

Defendants move to dismiss Johnson's Title VII race-discrimination claims for lack of subject-matter jurisdiction. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests subject-matter jurisdiction, which is "the court's statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); see Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 453 (4th Cir. 2012). "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co., 523 U.S. at 104; see, e.g., Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). In considering a motion to dismiss for lack of subject-matter jurisdiction, the court may consider evidence outside the pleadings without converting the motion into one for summary judgment. See, e.g., Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

Title VII prohibits employers from, among other things, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Before filing suit under Title VII in federal court, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC. See, e.g., Hentosh v. Old Dominion Univ., 767 F.3d 413, 416 (4th Cir. 2014). "Even after a plaintiff has exhausted his administrative remedies, the administrative framework plays a substantial role in focusing the formal litigation it precedes." Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005). The EEOC charge's content determines the scope of a plaintiff's right to maintain a Title VII claim in court. Id.; Hentosh, 767 F.3d at 416; Webb v. N.C. Dep't of Crime Control & Pub. Safety, Alcohol Law Enf't Div., 658 F. Supp. 2d 700, 707–08 (E.D.N.C. 2009). This court lacks jurisdiction over Title VII claims that exceed the scope of the EEOC charge. See, e.g.,

6

Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 407–09 (4th Cir. 2013); Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009); Chacko, 429 F.3d at 509–10.

"Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." Jones, 551 F.3d at 300 (quotation omitted); see Sydnor v. Fairfax Cty., Va., 681 F.3d 591, 594 (4th Cir. 2012); Chacko, 429 F.3d at 509–10. "Thus, factual allegations made in formal litigation must correspond to those set forth in the administrative charge." Bonds v. Leavitt, 629 F.3d 369, 379 (4th Cir. 2011) (quotation omitted). For example, "a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." Jones, 551 F.3d at 300; see Chacko, 429 F.3d at 509–10. But because laypersons often initiate the EEOC administrative process, courts construe EEOC charges liberally. See Sydnor, 681 F.3d at 594; Chacko, 429 F.3d at 509.

Johnson's race-discrimination claims were not stated in his EEOC charge, are not reasonably related to the claims stated in his EEOC charge, and could not have been developed by reasonable investigation of his EEOC charge. Johnson's EEOC charge did not formally allege race discrimination. Johnson checked only the "retaliation," "age," and "religion" boxes on his EEOC charge and left unchecked the box for "race." See [D.E. 20-2]. Failure to identify "race" as a basis for the EEOC supports concluding that Johnson failed to exhaust his administrative remedies concerning that claim. See Jones, 551 F.3d at 301; Chacko, 429 F.3d at 511–13; Miles v. Dell, Inc., 429 F.3d 480, 492 (4th Cir. 2005); Sloop v. Mem'l Mission Hosp., Inc., 198 F.3d 147, 149 (4th Cir. 1999).

Moreover, the factual allegations supporting Johnson's race-discrimination claim do not

7

appear in his EEOC charge and are not reasonably related to any allegations made in the charge. In his complaint, Johnson alleges (1) that Briney discriminated against him on the basis of race by including Johnson's tardiness in a negative evaluation, even though white substitutes who reported to work at the same time he did were not reprimanded, and (2) that Jacobson said that she had removed Johnson from the school's availability roles partly because Johnson played music in class, even though two white substitutes played music but were not reprimanded. See [D.E. 5-1] 4–5, 9. The EEOC charge, however, alleges no race discrimination on Briney's part and does not allege that Jacobson discriminated against Johnson based on his race by removing Johnson from the availability roles for playing music. See [D.E. 20-2]. Rather, in the EEOC charge Johnson alleged that Jacobson discriminated against Johnson on the basis of race by cancelling his assignments only to replace him "3 or 4" times with white substitutes. See [D.E. 20-2]. Thus, Johnson's claims in his complaint do not "correspond to those set forth in the administrative charge." Bonds, 629 F.3d at 379 (quotation omitted). Accordingly, Johnson failed to exhaust his administrative remedies for his race-discrimination claims, depriving the court of subject-matter jurisdiction over these claims. See Jones, 551 F.3d at 301; Miles, 429 F.3d at 492; Chacko, 429 F.3d at 511–13; Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132–33 (4th Cir. 2002); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962–64 (4th Cir. 1996); Webb, 658 F. Supp. 2d at 707–08.

III.

Defendants move to dismiss Johnson's remaining claims for failure to state a claim upon which relief can be granted. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Coleman v. Md. Court of Appeals, 626 F.3d

8

187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); accord Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (per curiam). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). The court, however, "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Id. Construing the facts in this manner, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quotation omitted).

The standard used to evaluate the sufficiency of a pleading is flexible, "and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson, 551 U.S. at 94 (quotation omitted). Erickson, however, does not "undermine [the] requirement that a pleading contain 'more than labels and conclusions.'" Giarratano, 521 F.3d at 304 n.5 (quoting Twombly, 550 U.S. at 555); see Iqbal, 556 U.S. at 677–83; Coleman, 626 F.3d at 190; Nemet Chevrolet Ltd., 591 F.3d at 255–56; Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009).

## A.

Johnson contends that Jacobson, Jones, and Buck violated his First Amendment right to free speech by cancelling his assignments following his in-class comments about the origins of Christmas.[1] "The First Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Adams v. Trustees of

---

[1] The First Amendment's guarantee of freedom of speech applies to the states through the Fourteenth Amendment's Due Process Clause. See, e.g., Sons of Confederate Veterans, Va. Div. v. City of Lexington, Va., 722 F.3d 224, 229 n.4 (4th Cir. 2013).

9

the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quotation omitted). Johnson's claim turns on the constitutional protection afforded to the speech of public employees.

The Pickering–Connick framework governs that analysis. See, e.g., Connick v. Myers, 461 U.S. 138 (1983); Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Adams, 640 F.3d at 562–64; Lee v. York Cty. Sch. Div., 484 F.3d 687, 692–94 & n.9 (4th Cir. 2007); Boring v. Buncombe Cty. Bd. of Educ., 136 F.3d 364, 368–69 (4th Cir. 1998) (en banc).[2] To state a claim under the Pickering–Connick framework, Johnson must plausibly allege that (1) he spoke as a citizen on a matter of public concern, rather than as an employee on a matter of private interest, (2) his interest in speaking on the matter of public concern outweighed the defendants' interest in providing effective and efficient public service, (3) defendants took some action against him that deprived him of a valuable government benefit or that would tend to chill his protected speech; and (4) a causal relationship existed between his protected speech and the retaliation. See, e.g., Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014); Bland v. Roberts, 730 F.3d 368, 373–75 (4th Cir. 2013); Peters v. Jenney, 327 F.3d 307, 322 (4th Cir. 2003); Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351–52, 356 (4th Cir. 2000); McVey v. Stacy, 157 F.3d 271, 277–78 (4th Cir. 1998).

---

[2] Defendants disagree and cite Garcetti v. Ceballos, 547 U.S. 410 (2006). In Garcetti, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. The Court, however, explicitly declined to decide whether that analysis "would apply in the same manner to a case involving speech related to scholarship or teaching." Id. at 425. In light of this reservation, the Fourth Circuit continues to apply the Pickering–Connick framework when the public employee whose right to free speech the state allegedly abridged was a teacher engaged in scholarship or classroom instruction. See Adams, 640 F.3d at 562–64; Lee, 484 F.3d at 694 n.11; cf. J.W. v. Johnson Cty Bd. of Educ., No. 5:11-CV-707-D, 2014 WL 4771613, at *8 n.4 (E.D.N.C. Sept. 24, 21014) (unpublished) (applying Garcetti to elementary school teacher's comments regarding administrative duties).

10

Two inquiries determine the scope of constitutional protection accorded to a public employee's speech. "The first requires determining whether the employee spoke as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418; see Lee, 484 F.3d at 694. If not, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 547 U.S. at 418. If so, the court proceeds to the second inquiry: "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. This determination requires weighing "the employee's interest in First Amendment expression" against "the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." Lee, 484 F.3d at 694 (quotation omitted). Employees speaking as citizens on matters of public concern "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti, 547 U.S. at 419.

The first inquiry—whether the employee spoke as a citizen on a matter of public concern—takes unique form when the employee is a teacher. "Courts have generally recognized that the public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and that a school board's ability in this regard exceeds the permissible regulation of speech in other governmental workplaces or forums." Lee, 484 F.3d at 695; see Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267–68 (1988). "In order to take account of the characteristics of a dispute involving in-class speech by a teacher-employee . . . special considerations should be assessed by a reviewing court on whether the contested speech constitutes a matter of public concern." Lee, 484 F.3d at 696. Whether the First Amendment protects a teacher's in-class speech depends on whether the speech at issue was "of a curricular nature." Lee, 484 F.3d at 696, 697 n.15; Boring, 136 F.3d at 367–69. If it was, then the speech does not constitute speech on a matter of public concern and

11

receives no First Amendment protection. Lee, 484 F.3d at 694, 697 n.15; Boring, 136 F.3d at 367–69. "Thus, when a First Amendment free speech dispute involves a teacher-employee who is speaking within the classroom, the determination of whether [his] speech involves a matter of public concern is dependent on whether or not the speech is curricular. This determination—whether the contested speech is curricular in nature—is a question of law for the court." Lee, 484 F.3d at 697.

A court decides whether a schoolteacher's in-class speech was curricular by applying the definition of "curriculum" in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 267 (1988). There, the Supreme Court defined "curriculum" as

> school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

Id. at 271. "To be curricular under this definition, the contested speech must satisfy both of the definition's categories of requirements." Lee, 484 F.3d at 697. First, "such speech must constitute school-sponsored expression bearing the imprimatur of the school." Id. Second, "the speech must also be supervised by faculty members and designed to impart particular knowledge to the students." Id.

1.

Several factors guide the analysis of whether Johnson's comment about Christmas deriving from pagan traditions might reasonably have been perceived as school-sponsored speech bearing the imprimatur of the school. For one, the definition of curriculum "encompasses more than simply objectives of a specific course of study taught by a particular teacher." Id. at 698. Instead, school-sponsored speech bearing the imprimatur of the school "include[s] a variety of expressive activities

12

that occur on school property." Id. Morever, "[i]n order to determine whether challenged teacher speech is school-sponsored and bears the imprimatur of the school, a reviewing court must examine whether it has been so closely connected to the school that it appears that the school is somehow sponsoring the speech." Id. (quotation omitted). "A reviewing court should also appraise the level of involvement the school had in organizing or supervising the contested speech." Id.

Applying this standard, the public might reasonably have perceived Johnson's comments as school-sponsored speech bearing the imprimatur of the school. See Kuhlmeier, 484 U.S. at 271. "As a general proposition, students and parents are likely to regard a teacher's in-class speech as approved and supported by the school, as compared to a teacher's out-of-class statements." Lee, 484 F.3d at 698. In Lee, the Fourth Circuit discussed cases from other circuits holding that teachers' in-class statements constitute school-sponsored speech subject to restriction. Id. For example, the First Circuit held that a biology teacher's in-class comments about abortion were not protected because "a teacher's statements in class during an instructional period are also part of a curriculum and a regular class activity." Ward v. Hickey, 996 F.2d 448, 450, 453 (1st Cir. 1993). Similarly, the Eleventh Circuit held that a university could restrict a professor's in-class references to his religious views under the university's "authority to reasonably control the content of its curriculum, particularly that content imparted during class time," and "the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university." Bishop v. Aronov, 926 F.2d 1066, 1074–76 (11th Cir. 1991). Likewise, the Tenth Circuit "distinguish[ed] between teachers' classroom expression and teachers' expression in other situations that would not reasonably be perceived as school-sponsored" in holding that a teacher's in-class discussion of a school rumor was subject to restriction. Miles v. Denver Pub. Sch., 944 F.2d 773, 777 (10th Cir. 1991). Here, members of the public "might reasonably perceive" that Johnson's

13

in-class statements regarding the origins of Christmas bear the imprimatur of the school. See Kuhlmeier, 484 U.S. at 267; Lee, 484 F.3d at 698.

The context of Johnson's statement bolsters this conclusion. According to Johnson, the students were "studying the five major religions around the world, in which Christmas was included as an aspect of Christianity." Compl. at 1. Johnson's grievance filed with Buck asserts that his statements were "within the perimeters [sic] of the lesson plan on the history of various religions around the world that included the celebration of Christmas." [D.E. 5-2]. Johnson classifies his statements as "quite relevant to the subject matter at hand as it was of historical facts." [D.E. 5-1] 3. This close connection between a teacher's statement and the curricular subject matter at hand buttresses the conclusion that Johnson's statements gave the appearance that the school was sponsoring the speech. See Kuhlmeier, 484 U.S. at 267; Lee, 484 F.3d at 698. That Johnson made his statements in response to a student's question about why Johnson did not celebrate Christmas does not sever this connection. In the context in which it was made—in class, relevant to the discussion at hand, and stated as a matter of objective fact—students "might reasonably perceive" Johnson's remarks as school-sponsored. See Kuhlmeier, 484 U.S. at 267; Lee, 484 F.3d at 698. Thus, Johnson's statement satisfies the first part of the definition of curricular speech.

2.

Although a broad category of speech made in a school setting is properly considered school-sponsored, the Kuhlmeier "definition also limits curricular speech by requiring that it be supervised by faculty members and designed to impart particular knowledge to the students." Lee, 484 F.3d at 699; Kuhlmeier, 484 U.S. at 267. Johnson's statement satisfies these requirements. As for the supervision component, Jacobson's authority to cancel substitutes' assignments necessarily entailed overseeing substitutes' performance and supervising their in-class conduct.

14

"Classroom speech can impart particular knowledge if its purpose is to convey a specific message or information to students." Lee, 484 F.3d at 699. That message need not concern traditional classroom instruction related to curricular objectives; a message equally falls within the latter half of Kuhlmeier's definition if it "instead constitute[s] information on social or moral values that the teacher believes the students should learn or be exposed to." Id. Johnson's account of his statement demonstrates the necessary design to impart particular knowledge to the students: his statements were "within the perimeters [sic] of the lesson plan on the history of various religions around the world that included the celebration of Christmas," [D.E. 5-2], and were "quite relevant to the subject matter at hand as it was of historical facts." [D.E. 5-1] 3. Johnson's statement that Christmas had a non-Christian origin had the purpose of "convey[ing] a specific message or information to students." Lee, 484 F.3d at 699. Even if Johnson stated this fact while describing why he personally does not celebrate Christmas, his statement of "historical fact" to describe his stance had the purpose of conveying that historical information to students. See id. at 699–700. Thus, Johnson's statement satisfied the second component of Kuhlmeier's definition of curricular speech.

In holding that Johnson's statement constituted curricular speech, the court recognizes "that the determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board rather than with the federal courts." Kuhlmeier, 484 U.S. at 267 (citations omitted); see Lee, 484 F.3d at 700. Schools must retain the authority to refuse "to associate the school with any position other than neutrality on matters of political controversy." Kuhlmeier, 484 U.S. at 272. Because Johnson's statement constituted school-sponsored speech bearing the imprimatur of the school and was designed to impart particular knowledge to his students, it was curricular in nature. As such, Johnson's speech was not speech on a matter of public concern, and Johnson's First

15

Amendment claim fails. See, e.g., Garcetti, 547 U.S. at 418; Lee, 484 F.3d at 699–700; Boring, 136 F.3d at 367–69.

B.

Johnson asserts that Briney, Jacobson, Cook, Jones, and Buck violated his Fourteenth Amendment right to procedural due process. As to Briney, Johnson alleges that Briney infringed this right by barring Johnson from substituting at Farmville Middle School without first consulting Johnson about Briney's concerns and by submitting a negative evaluation of Johnson that was "unfounded on its face." Johnson asserts that the other defendants violated his right to procedural due process by cancelling Johnson's scheduled substitution assignments at J.H. Rose.

The Fourteenth Amendment reads in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "The procedural component of due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." D.B. v. Cardall, 826 F.3d 721, 741 (4th Cir. 2016) (quotation omitted). To succeed on a procedural-due-process claim, a plaintiff must demonstrate that some form of state action deprived him of a constitutionally protected liberty or property interest without adequate procedural safeguards. See, e.g., Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013). This inquiry involves a two-step examination: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (citations omitted).

"Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States." Id. Protected property interests, on the other hand, derive not from the

16

Constitution but from "existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972); see Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); Bishop v. Wood, 426 U.S. 341, 344 (1976). Regardless of the interest claimed, "an individual claiming a protected interest must have a legitimate claim of entitlement to it," as opposed to "an abstract need or desire" or "unilateral hope." Thompson, 490 U.S. at 460 (quotations and citations omitted); see Pittman v. Wilson Cty., 839 F.2d 225, 227 (4th Cir. 1988).

Johnson's claim that defendants' actions in cancelling his teaching assignments deprived him of due process implies a claim to a property interest in continued assignment as a substitute teacher. Any such enforceable expectation must flow from a guarantee to continued assignment under North Carolina law. See, e.g., Roth, 408 U.S. at 577; Knight v. Vernon, 214 F.3d 544, 553 (4th Cir. 2000); Roberson v. City of Goldsboro, 564 F. Supp. 2d 526, 529–31 (E.D.N.C. 2008); Whitesell v. Town of Morrisville, 446 F. Supp. 2d 419, 423–24 (E.D.N.C. 2006). North Carolina, however, is an at-will employment state. Knight, 214 F.3d at 553. "[A]bsent an employment contract for a definite period of time, both employer and employee are generally free to terminate their association at any time and without reason." Head v. Adams Farm Living, Inc., 775 S.E.2d 904, 909 (N.C. Ct. App. 2015) (quotation omitted); see Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). An at-will employee has no protected property interest by virtue of his employment and must instead cite a statute, ordinance, or contract providing a right to continued employment. See Pittman, 839 F.2d at 277; Peace v. Emp't Sec. Comm'n, 349 N.C. 315, 321, 507 S.E.2d 272, 277 (1998); Nantz v. Emp't Sec. Comm'n, 290 N.C. 473, 477–82, 226 S.E.2d 340, 343–45 (1976); McCallum v. N.C. Co-op. Extension Serv. of N.C. State Univ., 142 N.C. App. 48, 56, 542 S.E.2d 227, 234 (2001). Absent one of those sources providing for a continued right to employment, a

17

North Carolina public employee cannot demonstrate a property interest sufficient to state a procedural-due-process claim. See, e.g., Knight, 214 F.3d at 553; Roberson, 564 F. Supp. 2d at 529–31; Whitesell, 446 F. Supp. 2d at 423–24; Peace, 349 N.C. at 321, S.E.2d at 277.

As a substitute teacher, Johnson was an at-will employee. Johnson cites no contract, statute, or ordinance entitling him to continue receiving assignments as a substitute teacher. Instead, Johnson contends that he has a property interest in continued assignment as a substitute teacher by virtue of having worked as a substitute teacher for Pitt County Schools for ten years. See [D.E. 23] 7. This longevity of employment may well have created a unilateral expectation in Johnson of continued opportunities to teach, but to have a protected property interest Johnson "must have more than a unilateral expectation of it." Roth, 408 U.S. at 578; see In re Premier Auto. Servs., Inc., 492 F.3d 274, 282–83 (4th Cir. 2007); Pittman, 839 F.2d at 227. "Mere longevity of employment, even though the employee's service be of excellent quality, does not confer upon the employee" a property right. Nantz, 290 N.C. at 477, 226 S.E.2d at 343. Thus, Johnson fails to allege a protected property interest in receiving future assignments sufficient to implicate the Fourteenth Amendment's guarantee of procedural due process and his claim fails. See, e.g., Johnson v. Pitt Cty. Sch., No. 4:12-CV-191-BR, [D.E. 35] 16–17 (E.D.N.C. Nov. 12, 2013) (unpublished).

Likewise, Johnson's allegations that Briney violated Johnson's procedural due process rights by not consulting Johnson before requesting that he not return as a substitute and by completing a negative evaluation of Johnson that was "unfounded on its face" fail to state a claim. In opposition to this conclusion, Johnson cites (though not in his complaint) the "Principal's Responsibility section" of the "Pitt County School Substitute Teacher Handbook." See [D.E. 23] 7–8. According to Johnson, that section "states that one of the principal's duties is 'to conference with the substitute personally about any concerns of the staff or about any problem encountered. After at least one

18

conference has taken place the principal may request the removal of a substitute from his/her substitute list.'" Id.

In North Carolina, "an employer's personnel manual or policies are not part of an employee's contract of employment unless expressly included in that contract." Knight, 214 F.3d at 553; Soles v. City of Raleigh Civil Serv. Comm'n, 345 N.C. 443, 480 S.E.2d 685, 687 (1997). Johnson does not allege that his employment contract expressly incorporated the Handbook, or that the Handbook's procedures were enacted as an ordinance or statute that could create a protected property interest. Thus, the Handbook does not create a protected property interest sufficient to trigger the Fourteenth Amendment's due-process protections, and his claim fails. See Knight, 214 F.3d at 553; Pittman, 839 F.2d at 226–29; Snow v. N.C. Dep't of Health & Human Servs., No. 5:12-CV-724-FL, 2014 WL 808646, at *9 (E.D.N.C. Feb. 28, 2014) (unpublished); Whitesell, 446 F. Supp. 2d at 423–24.

The same conclusion applies to any alleged property interest in an accurate evaluation. Johnson cites no law or ordinance entitling him to an accurate evaluation, and his complaint does not allege a contractual source for such a right. Thus, the claim fails. Moreover, to the extent this claim, liberally construed, implies a liberty interest in a reputation untarnished by false statements, "the Supreme Court has required plaintiffs in cases involving allegedly defamatory statements by the government to show more than reputational injury in order to prevail on a constitutional claim." Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 314–15 (4th Cir. 2012). To state such a claim as a public employee, Johnson "would have to allege facts tending to show that his superiors made charges against him that might seriously damage his standing and associations in his community or otherwise imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities; that those charges were made public by his employer; and that

the charges were false." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n.5 (4th Cir. 1988) (quotations and citations omitted). Johnson does not plausibly allege either that the evaluation hampered his ability to secure employment opportunities or that his employer made the evaluation public. Having failed to plausibly allege a protected property or liberty interest, Johnson fails to state a claim for violation of his Fourteenth Amendment right to procedural due process.[3]

C.

Johnson asserts claims under Title VII against Jacobson (for race discrimination), Briney (for race discrimination), and Buck (for retaliation) in their individual capacities. He also alleges an age-discrimination claim under the ADEA against Jacobson. Individual employees, however, are not liable in their individual capacities under either Title VII or ADEA. See Lissau v. S. Food Serv., Inc., 159 F.3d 177, 180 (4th Cir. 1998); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510–11 (4th Cir. 1994); Ward v. Coastal Carolina Health Care, P.A., 597 F. Supp. 2d 567, 570 (E.D.N.C. 2009). Thus, Johnson fails to state a claim under Title VII or the ADEA against these defendants in their individual capacities.

D.

Johnson's remaining claims allege age discrimination under the ADEA and retaliation under Title VII against the Pitt County Board of Education. Because these claims share a common

_____

[3] In his response to defendants' motion to dismiss, Johnson for the first time contends that defendants deprived him of a protected liberty interest in "only having to walk a block and a half to get to work, requiring no wear and tare [sic] on my car or gas for and helps me to comply with doctors orders, which is to walk for health benefit." [D.E. 23] 8–9. He also contends—again for the first time—that he had a protected property interest in making 80 dollars on the days Jacobson cancelled his assignments. Id. at 9. Johnson admits that these allegations and theories of liability appear nowhere in his complaint. Id. Johnson cannot use his briefing in opposition to a motion to dismiss to amend his complaint. See, e.g., Jemsek v. N.C. Med. Bd., No. 5:16-CV-59-D, 2017 WL 696721, at *12 (E.D.N.C. Feb. 21, 2017) (unpublished); Bryant v. Wells Fargo Bank, Nat. Ass'n, 861 F. Supp. 2d 646, 653 (E.D.N.C. 2012); Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 542 (E.D.N.C. 2008).

analytical framework, the court considers them together. Johnson has not alleged direct evidence of illegal discrimination, and proceeds under the McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, a plaintiff first must establish a prima facie case of discrimination. See, e.g., O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310–12 (1996); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas Corp., 411 U.S. at 802; Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250–52 (4th Cir. 2015); Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006) (en banc). If the plaintiff establishes a prima facie case, "the burden shifts to the employer . . . to articulate a legitimate, non-discriminatory reason for the adverse employment action." Lettieri v. Equant, Inc., 478 F.3d 640, 646 (4th Cir. 2007) (quotation omitted); see St. Mary's Honor Ctr., 509 U.S. at 506–07. If the defendant–employer meets its burden of production, then the plaintiff must prove by a preponderance of the evidence that a genuine issue of material fact exists concerning whether the employer's stated reason for the adverse employment action was a mere pretext for illegal discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Lettieri, 478 F.3d 646–47. "At this last step the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been a victim of intentional discrimination." Lettieri, 478 F.3d at 646–47 (quotation omitted) (alteration in original). A plaintiff demonstrates pretext by showing that the defendant–employer's "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [unlawful] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

1.

Johnson alleges that Jacobson discriminated against him based on his age by failing to further

21

investigate Johnson's in-class statement although she previously investigated complaints lodged against a substitute teacher who was fifteen years younger than Johnson and ultimately cleared that younger substitute teacher of wrongdoing. To establish a prima facie case under the ADEA, a plaintiff must show that (1) he was a member of the protected class, i.e., "individuals who are at least 40 years of age," 29 U.S.C. § 631(a); (2) his job performance met his employer's legitimate expectations at the time of the adverse employment action; (3) the employer took adverse employment action against him; and (4) the employer took that adverse action under circumstances giving rise to an inference of age discrimination. See O'Connor, 517 U.S. at 310–13; Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

In the Title VII context, the Fourth Circuit has held that at the Rule 12(b)(6) stage a plaintiff–employee need plausibly allege only a statutory claim, not a prima facie case. See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585–88 (4th Cir. 2015), cert. denied, 136 S. Ct. 1162 (2016). Because both the ADEA and Title VII target employment discrimination and use the same analytical framework, the court applies this principle to Johnson's ADEA claim.

Under the ADEA, an employer cannot "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA's protection against age discrimination covers only "individuals who are at least 40 years of age." 29 U.S.C. § 631(a). To prevail on an age-discrimination claim, a plaintiff must prove that "age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009); see EEOC v. Baltimore Cty., 747 F.3d 267, 273 (4th Cir. 2014). Thus, to state an ADEA claim a plaintiff must plausibly allege a but-for causal

22

connection between his age and the employer's adverse employment action. See Gross, 557 U.S. at 176–77; Baltimore Cty., 747 F.3d at 273.

Johnson fails to plausibly allege an ADEA violation. First, Johnson does not allege that he is at least 40 years old and thus a member of the protected class, and the court cannot infer this fact from the allegations in his complaint. See Gray v. Brent, No. 7:13-CV-198-BR, 2014 WL 1327011, at *7 (E.D.N.C. Apr. 2, 2014) (unpublished); Bullock v. Spherion, No. 3:10-CV-465, 2011 WL 1869933, at *5 (W.D.N.C. May 16, 2011) (unpublished); Keene v. Thompson, 232 F. Supp. 2d 574, 582 n.8 (M.D.N.C. 2002).

Second, even if Johnson had alleged that he was at least 40 years old, Johnson does not plausibly allege that the Pitt County Board of Education cancelled his assignments because of his age. All Johnson alleges is that Jacobson suspended a younger substitute teacher "for something he was alleged to have said in a history class" but after further investigation "discovered that there was no merit in the students' complaints, and allowed him to come back to the school as a substitute." [D.E. 5-1] 5. Without knowing more about the circumstances surrounding the two situations, the court would have to speculate to determine that no factors other than age accounted for Jacobson's actions. For example, did the younger substitute admit to Jacobson that he had made the statements, as Johnson did during his meeting with Jacobson the day after the incident? Or did the younger substitute deny making the statements, necessitating further investigation not necessary in Johnson's case? Did other reasons prompt Jacobson to further investigate the younger substitute's alleged statements, reasons not implicated in Johnson's case? Did Jacobson undertake an investigation immediately in the case of the younger substitute? Or did she treat him the same as she did Johnson until something came to her attention later that caused her to revisit her decision, perhaps something that did not happen in Johnson's case? Simply put, the court cannot determine that Johnson and the

23

younger substitute were sufficiently similarly situated to conclude that Jacobson treated Johnson differently because of his age. That Jacobson investigated allegations made against a substitute fifteen years younger than Johnson may be consistent with discrimination, but it does not alone plausibly suggest that disparate treatment occurred because of Johnson's age. See McCleary-Evans, 780 F.3d at 585–86. Here, Johnson's allegations do not plausibly support a reasonable inference of age discrimination. Thus, Johnson fails to state a claim for age discrimination under the ADEA.

2.

Johnson alleges retaliation in violation of Title VII. Specifically, Johnson alleges that the Pitt County Board of Education retaliated against Johnson "for having named [Buck] as a defendant in a lawsuit 3 years earlier." [D.E. 5-1] 8.

To establish a prima facie case of retaliation, a plaintiff must prove that (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him that a reasonable employee would find materially adverse; and (3) there was a causal link between the two events. DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Balas, 711 F.3d at 410; see Nassar, 133 S. Ct. at 2533; Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

To survive a motion to dismiss, a Title VII plaintiff must plausibly allege his statutory claim, not a prima facie case. See McCleary-Evans, 780 F.3d at 585–88. In relevant part, Title VII's retaliation provision prohibits an employer from discriminating against any individual "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII requires the employee to show "that retaliation was a but-for cause of a challenged adverse employment action." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216-17 (4th Cir. 2016) (quotation omitted); see Nassar,

24

133 S. Ct. at 2533. Thus, to survive a motion to dismiss a plaintiff–employee must plausibly allege a but-for causal connection between his protected activity and the alleged retaliation. See, e.g., Blomker v. Jewell, 831 F.3d 1051, 1059 (8th Cir. 2016) (quotation omitted); Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015); accord McCleary-Evans, 780 F.3d at 585–88.

Although Johnson's 2012 EEOC charge and 2012 Title VII lawsuit constituted protected activity, he fails to plausibly allege any causal connection whatsoever, let alone but-for cause, between that 2012 protected activity and the 2015 adverse employment action. Temporal proximity between an employer's knowledge of protected activity and an adverse employment action provides one relevant consideration. See, e.g., Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004). Although an adverse action undertaken very shortly after the employer learned of the protected activity typically satisfies the causation showing, a "lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, . . . negates any inference that a causal connection exists between the two." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (three years lapsed between protected activity and allegedly adverse employment action); see Breeden, 532 U.S. at 274 ("Action taken (as here) 20 months later suggests, by itself, no causality at all."). A plaintiff can rebut this conclusion by plausibly alleging that actions taken during the intervening period demonstrate retaliatory animus. See Lettieri , 478 F.3d at 650; Miles, 429 F.3d at 491; King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998).

More than three years passed between Johnson's protected activity and the alleged adverse employment action—Bucks's "granting" of a request that Johnson not return to teach at Farmville Middle School. Compare Complaint, Johnson v. Pitt Cty Sch., No. 4-12-CV-191-BR, [D.E. 4]

25

(E.D.N.C. Aug. 24, 2012), with [D.E. 5-3]. This lengthy time lapse defeats any plausible inference of but-for causation. See Breeden, 532 U.S. at 274; Dowe, 145 F.3d at 657. Moreover, Johnson alleges no intervening acts that suggest retaliatory animus. See Pettis v. Nottoway Cty. Sch. Bd., 592 F. App'x 158, 161 (4th Cir. 2014) (per curiam) (unpublished); Perry v. Kappos, 489 F. App'x 637, 643–44 (4th Cir. 2012) (per curiam) (unpublished); Johnson v. Wheeling-Pittsburgh Steel Corp., 279 F. App'x 200, 205 (4th Cir. 2008) (per curiam) (unpublished); Causey, 162 F.3d at 803. Thus, Johnson fails to plausibly allege a Title VII retaliation claim.[4]

### IV.

In sum, the court lacks subject-matter jurisdiction over Johnson's Title VII race-discrimination claims. Johnson's remaining claims fail to state a claim upon which relief can be granted. Thus, the court GRANTS defendants' motion to dismiss [D.E. 20] and DISMISSES the complaint without prejudice.

SO ORDERED. This _25_ day of May 2017.

JAMES C. DEVER III
Chief United States District Judge

---

[4] In his EEOC charge, Johnson alleges that Jacobson and Briney discriminated against him in violation of Title VII by cancelling his assignments in retaliation for Johnson filing the 2012 EEOC charge upon which he based his 2012 lawsuit. See [D.E. 20-2]. Johnson, however, did not pursue these claims in his complaint and therefore abandoned them. See McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 612 n.6 (E.D.N.C. 2006).